SOVEREIGN CAMP, WOODMEN OF THE WORLD, v. BERTHA ROTHSCHILD.

Delivered February 13, 1897.

**1. Mutual Benefit Insurance — Reinstatement of Suspended Member — Notice of Subsequent Assessments.**

Where a member of a mutual benefit society, whose constitution and laws provide that suspended members may be reinstated only upon payment of "all arrearages of every kind," and that the failure to receive a notice of assessment shall not relieve a member from forfeiture for nonpayment thereof, has been suspended for nonpayment of one month's assessment, he is not entitled to reinstatement on payment of such assessment, where other later assessments have then become due, without also paying the latter, although he may not have received notice of such later assessments.

**2. Same—Payment of "All Arrearages."**

A suspended member of a mutual benefit society whose laws provide that suspended members may be reinstated only upon payment of "all arrearages of every kind," is not entitled to reinstatement without payment of assessments levied while he was suspended; and the fact that during such time he was not entitled to the benefits of the order does not exempt him from such payment.

**3. Same—Authority of Subordinate Receiving Officers—Agent of Member Only.**

Where the constitution and laws of a mutual benefit society provide that clerks of subordinate camps cannot bind the sovereign camp by any act outside their express authority, and are not authorized to reinstate suspended members, and in receiving and forwarding payments of assessments and dues are the agents of the member, and not of the sovereign camp, the latter is not estopped to deny that a member has been reinstated by the action of a clerk of a subordinate camp in receiving from such suspended member and retaining a less sum than the total amount of arrearages due by such member.

APPEAL from Dallas. Tried below before Hon. EDWARD GRAY.

*Seay & Seay* and *Brome & Burnett,* for appellant.—1. Appellee's right to recovery in this case depends upon the validity of the certificate at the date of Jacob Rothschild's death. Beyond controversy he was suspended June 1, 1895, and the certificate at once became null and void. It could not be validated without he was reinstated, for the certificate itself, by its very terms, restricted its validity to his good standing in the order. The laws of the order plainly provided how a suspended member could be reinstated. The law and the courts recognize

no other method for doing so. Reinstatement in the order required the payment of all arrearages accrued down to the application for reinstatement. 60 Texas, 535; 60 Texas, 572; 25 S. W. Rep., 1084; 2 Bacon on Benefit Societies, 763; 2 Bacon on Benefit Societies, 821.

2. The court erred in concluding as facts that the laws of the order required that Rothschild should be notified of local camp assessments for June, 1895, and that such was the order's custom. There is no such requirement in the laws of the order, and there is absolutely no evidence of any such custom. The laws of the order speak for themselves, and the evidence is to the contrary.

3. Rothschild was a suspended member, and notice of the subsequent assessments (for June) was not required to be given him. Under the law he remained suspended until reinstated, and he could not be reinstated until all arrearages were paid by him. The duty devolved upon him to ascertain what they were should he wish to be reinstated, and not upon the order to keep him posted or to notify him as the assessments and arrearages accrued. This proposition seems too plain for controversy. See Constitution and laws of the order; 60 Texas, 535-572; May on Insurance, sec. 552.

4. The court also erred in finding as matter of law that Rothschild was entitled to notice of the dues and assessments levied for June, 1895, and due and payable July 1, 1895. This is in direct conflict with the laws of the order. Being a suspended member, he was dropped from the roll, and so remained until reinstated. If never reinstated, the matter of subsequent dues and assessments was of no concern to him; so long as he was in this condition, he was not liable to the order therefor, and the order was not liable to him upon the certificate. It was only in the event he asked to be reinstated that dues and assessments accrued during his suspension became a matter of concern to him as well as the order. Constitution and laws of the order; 153 Mass., 83; 26 N. E. Rep., 236; Sup. Lodge K. of H. v. Keener, 25 S. W. Rep., 1084; 2 Bacon on Benefit Societies, 763-767.

5. The court erred in concluding that the action of the clerk, on July 15, 1895, in accepting part of the sum by him claimed, and allowing Rothschild to leave under the impression that he was protected, and that payment of the $2.15 balance next morning would be satisfactory, estops defendant from denying liability on said certificate. This is a singular statement and application of the doctrine of estoppel. Estoppel is invoked and applied in cases only where one party has said or done that, the natural and necessary effect of which was to mislead and did mislead the other party to his injury. In such cases estoppel only applies when one party has said or done something that naturally and necessarily misled the other party to his injury. The facts established nothing of this sort. Besides, the clerk was not the agent of the sovereign, but of Rothschild, the member. 75 Texas, 698; 66 Texas, 23, 617; 68 Texas, 474; 65 Texas, 495· 71 Texas, 689; 21 Texas, 248; 25

Texas, 11; 28 Texas, 731; Bigelow on Estoppel, 484, 72 Texas, 193; 2 Bacon on Benefit Societies, 829, 832-856, note 2, 879.

*R. E. Cowart* and *Victor H. Hexter*, for appellee.—1. An agreement on part of the clerk of the Memphis Camp to accept the balance due, on the next morning, constituted a waiver of the forfeiture and an extension of the time of payment and the tender of the sum due within the time of extension was sufficient. Bacon on Benefit Societies, sec. 432; Murphy v. Insurance Co., 3 Baxter, 440; and this too, although Rothschild had died pending the period of extended payment. Stapp v. Mutual Ben. Assn., 77 Texas, 517.

2. The facts alleged showed a waiver of a forfeiture for non-payment of the June assessment by a receipt of the May assessment at a time when the June assessment was then due and payable. Bacon on Ben. Soc., sec. 481; Niblack on Ben. Soc., secs. 301, 302; De Freece v. Insurance Co., 19 N. Y. Supp., 8.

3. While it is true Rothschild had been suspended from the order, it is submitted that the amount of May assessments, $2, for the non-payment of which he had been suspended, constituted all of his arrearages on July 15, 1895, for he was not liable for dues and assessments accruing pending his suspension, for the reason that at the date of his suspension the mutual liability existing between him and the order ceased. Bacon, Ben. Soc., sec. 378; Niblack, Ben. Soc., sec. 308; and for the further reason that he had received no notice of such assessment, as required by the laws of the order. Niblack on Ben. Soc., sec. 257; Bacon on Ben. Soc., secs. 377-379; K. of H. v. Nicker, 72 Texas, 261; McCorkle v. Insurance Co., 71 Texas, 149; Hammin v. Nadel, 36 S. W. Rep., 616.

4. The money for the May assessment was paid to the proper officer to receive such payment, and was remitted by him to superior officer. It was received and retained by both officers with the knowledge that according to their contention a further sum of $2.15, for a later assessment, was then due and unpaid, and the order thereby was estopped from claiming a forfeiture of the certificate by the reason of the non-payment of such subsequent assessment. Bacon, Ben. Soc., sec. 431; Niblack, Ben. Soc., sec. 302; De Freece v. Insurance Co., 19 N. Y. Supp., 8.

FINLEY, ASSOCIATE JUSTICE.—This suit was brought to recover upon a beneficiary certificate issued by defendant; brought by the beneficiary named therein. Defendant filed exceptions general and special to the petition, a plea of general denial, and by special pleas also denied any liability thereon.

Among other things, it averred that said certificate was issued and accepted subject to all the terms and conditions named therein and on the back thereof; that said Jacob Rothschild failed to comply therewith; that he was suspended from membership in the Order mentioned therein;

that by such suspension said certificate, by its express terms, and under the laws of said order, became null and void and of no effect, and so continued until his death; that he was not in good standing in said Order when he was killed in a personal difficulty on July 15, 1895; that he died in consequence of the violation of the laws of the State where he was killed, and that by the terms of said certificate and the laws of said Order, this fact, as well as his suspension, avoided said certificate, and that no recovery could be had thereon.

Plaintiff replied by supplemental petition, to which defendant filed exceptions general and special, and pleas of general and special denial.

The supplemental petition was, in substance: (1) A general denial; (2) Denial that said Jacob Rothschild had violated any conditions of the policy sued on, or any law or regulation of the Order; (3) That at the time of the death of said Rothschild he had paid to the proper officers thereof all dues and assessments then legally assessed against him; (4) That on the first Monday in June, 1895, her husband was suspended for the non-payment of assessments No. 47 and 48, called in May, 1895; that thereafter, on July, 15, 1895, a few hours before his death, he paid to the clerk of Live Oak Camp, the proper officer to receive such payment, the sum of $2 to cover said assessments Nos. 47 and 48, and for which said clerk issued to him an official receipt; that by reason of the payment of said $2 and the receipt thereof by said clerk, said Rothschild then being in good health, he was under the laws of the Order fully reinstated as a member of the Order, and the said certificate sued on was again in full force and effect. (5) That appellant was estopped from denying the good standing of her husband and its liability on the certificate, for the reason, that at the time of the payment of said $2 on July 15, 1895, which amount it retained, the said Rothschild was for the first time informed of his further indebtedness of $2.15, which amount it was agreed between said Rothschild and said clerk might be paid the next morning, at which time said sum of $2.15 was tendered and wrongfully refused. (6) That appellant was also estopped from denying the good standing of her husband in its Order, for it is true that her said husband was indebted to the Order in the further sum of $2.15 to cover June dues and assessments at the time of the payment of said $2 to cover assessments Nos. 47 and 48 on July 15, 1895; that by reason of the receipt and retention of said $2 on said July 15, 1895, the appellant was further estopped from claiming that said Rothschild was not in good standing by the non-payment of said $2.15. (7) That it. is true her husband was killed in an altercation with one White, at Memphis, Tennessee, on July 15, 1895, but he was killed while resisting an attack by said White which he was lawfully entitled to do.

The case was tried before the court without a jury and resulted in a judgment for plaintiff, from which the defendant has appealed.

.The following facts were shown upon the trial: The Woodmen of the World is a secret, benevolent, mutual benefit order, and its Sov-

ereign Camp is its supreme law-making body.  Defendant is a corporation organized under the laws of Nebraska.  Jacob Rothschild became a member of said fraternity, and the certificate in question was issued in November, 1894.  His right to participate in its beneficiary fund to the amount of $2000, payable at his death to his wife, is limited thereby as follows:  "While in good standing as a member of this fraternity." It stipulates that it is issued and accepted subject to all the conditions on its back named in the Sovereign Constitution, laws and by-laws of this fraternity, and liable to forfeiture if said Jacob Rothschild shall not comply with said conditions, constitution, fundamental laws and such by-laws and rules as are or may be adopted by the Sovereign Camp, Head Camp or camp of the jurisdiction of which he is a member at the date of his death.  Among the conditions on said certificate and referred to and made part thereof, are:

"1.  His agreement to pay all assessments and dues that may be levied during the time he shall remain a member of the Woodmen of the World.

"2.  In case of his death, while a member of this fraternity in good standing, his beneficiary shall receive such sum as may be collected from an assessment, etc., not to exceed the amount stated on the face of this certificate.

"3.  If the admission fees and dues are unpaid as required by the laws of the fraternity, and if beneficiary fund assessments assessed against the person named in this certificate are not paid the clerk before the first day of the month following the levy of the same, then this certificate shall be null and void and continue so until payment is made and the requirements of the constitution, fundamental laws and by-laws of this fraternity have been complied with, in which event it shall become restored.

"4.  If a member holding this certificate * * * shall die, in consequence of the violation or attempted violation of the laws of the State or of the United States, * * * this certificate shall be null and void and of no effect, and all moneys which shall have been paid, and all rights and benefits which may have accrued on account of this certificate shall be absolutely forfeited without notice or service."

The laws of the order specially provide that the conditions referred to and made part of this certificate should "be made a part of every beneficiary certificate," etc.  Said certificate was also endorsed as follows:  "Important.  The member should see that his assessments and dues are all paid on or before the first day of every month."  The laws of the order provide that, "it shall be the duty of every member who may not receive a notice from the clerk of a camp for the payment of assessments or dues, to inquire of the clerk of the camp on or before the first day of each month whether any calls for assessments or dues have been made or liability incurred against him, and if any, he shall pay the same according to the call of the Sovereign Camp and by-laws

of the camp or vote of the same, and upon failure to do so shall stand suspended.

"Every member shall be notified by the clerk whenever an assessment is ordered to be levied, before the 10th day of every calendar month, unless the official notice is ordered by the sovereign executive council, to be published in an official organ. If a member fails to pay same before the first day of the following month, he shall stand suspended, and during such suspension his beneficiary certificate shall be void by operation of the laws of the order, without any notice being given to him or any action of the order or any of its officers in relation thereto. Except that the suspension shall be held as null and void in case it be conclusively shown that the Sovereign failing to make such payment was, at the date of suspension, incompetent through illness or mental disability to attend to his usual and ordinary business; provided, such showing be made and established and actual payment made within thirty days after the date when the same became due and payable."

Also, that failure of clerk to notify members of assessments and dues "shall not relieve a member from the payment of assessments or dues, according to the call or requirement of the Sovereign Camp, or Camp, and he shall stand suspended for nonpayment of same as if he had received actual notice."

Also, that "on or before the last day of each month, each member shall pay the assessments and dues, if any, which have been levied for the month. A member failing to pay any assessments or dues within the time required by law, shall stand suspended, and shall not thereafter be entitled to any of the benefits of the order, and his certificate shall be canceled and void, etc., and "he cannot attend any meetings of his camp until he has been duly reinstated in accordance with the laws of the order."

Also, that "the officers of a camp, in giving notice of assessments and in collecting and forwarding assessments to the Sovereign Camp, shall be the agents of the members of their camp, and shall not be the agents of the sovereign camp."

Also, that "if all arrearages of every kind are paid within three months from the date of suspension, the member, if in his usual health, shall be restored, and his beneficiary certificate made binding as soon as said payment is received and recorded by the clerk. If the clerk has reason to believe that the health of the member is impaired, or if he does not appear in person to make payment, the clerk shall investigate his health and habits, at the time, and also refer the case to the consul commander for further investigation, who shall proceed to make the same, and report back to said clerk his judgment therein, with orders to reinstate, or forbidding the same, as he shall determine," etc.

Also, that "a clerk shall not reinstate a suspended member, except as hereinbefore provided; and in every case for reinstatement under sections 128 and 129, the member shall make application in writing, upon

the official form provided, which shall state the condition of his health at the time and must be signed by him."

"The clerk of a camp shall not by acts, representations, waivers or vote of his camp, have any power or authority not delegated to him or a camp by the constitution and by-laws of the order to bind the Sovereign Camp, head camp or a camp."

Also that "every camp shall establish an amount of annual dues sufficient to meet its current expenses and to pay the Sovereign Camp per capita tax and any special tax that may be levied." That "the camp dues shall be payable quarterly in advance," etc. That "the regular per capita tax shall be due and payable to the Sovereign Camp on the first days of January and July of each year, in advance," etc., and that "the Sovereign Camp shall fix the amount of general fund dues which shall be paid by camps not under the jurisdiction of a head camp, which dues shall not exceed two dollars in any one year." And that "the camp, by a two-thirds vote, can at any time levy a special assessment, in addition to the regular dues, to pay actual expenses and Sovereign Camp per capita; but said special assessment shall not exceed one dollar during any one year in excess of the regular dues." And that "a suspended member is not entitled to any benefits of the order, either fraternal or financial," etc.

The whole of the constitution and laws of the order were submitted in evidence. Rothschild was suspended March 1, 1895. He was reinstated April 1, 1895. He was again suspended June 1, 1895, for nonpayment of assessments Nos. 47 and 48 amounting to $2, payable in May, 1895. He was duly notified of his suspension and that his certificate was void and of no effect, and on the back of the notice was printed full instructions as to how under the laws of the order he might be reinstated and his certificate validated. During June, 1895, Sovereign Camp dues 15 cents, and local camp assessment for paraphernalia fund, $1, and Sovereign Camp assessment No. 49, for $1, making $2.15, were levied, and these were payable before the last day of June, 1895.

On July 15, 1895, with his suspension in full force, Rothschild called on the clerk of his camp and laid a Mr. Crane's assessment book on the clerk's desk and paid Crane's assessments and dues. The clerk was not personally acquainted with Rothschild, and thought it was Mr. Crane who was paying Crane's assessments; and remembering that Rothschild appeared on the clerk's post office list or address of members as at the same street and number, he asked the person whom he supposed to be Crane, "What has become of our friend Rothschild?" He replied, "I don't know," etc. He then asked the clerk "How much does Rothschild owe?" The clerk told him $4.15, or $2 for May and $2.15 for June. He thereupon paid the clerk $2 for Rothschild, saying he did not have money enough to pay the balance; that he would send it next morning for the month of June. To this the clerk made no reply, but gave him a receipt for the $2, and he went out. Learning that night

that Rothschild had been shot, the clerk went to the undertaker where the body was and was surprised to find that it was the same person who had visited him that afternoon, and whom he supposed to be Crane. On the morning after Rothschild was killed, a letter from Mr. Crane was handed the clerk in his office. It contained $2.15 and asked the clerk to accept it and reinstate Rothschild. He at once put the letter and money back in the envelope and returned it to the person who had brought it, with the statement that he declined to receive it, as Rothschild was dead and he could not reinstate a suspended member after he was dead. The $2 paid July 15 has been regularly tendered back to the plaintiff.

Rothschild was killed in a personal difficulty with Dr. White, at Memphis, Tennessee, under circumstances which showed White to be the aggressor and Rothschild not in fault, and not at the time violating the law.

Upon this state of facts the court below pronounced the following legal conclusions:

"From the foregoing facts, I am of opinion that the payment to the clerk by Rothschild of the $2 for the month of May, 1895, on July 15, 1895, reinstated and restored said Rothschild to good standing in said fraternity, and made said beneficiary certificate binding. That said Rothschild was entitled to notice of the dues, and local camp assessments of $1, and Sovereign Camp assessment No. 49 of $1, assessed and levied for the month of June, 1895, and due and payable July 1, 1895; that no notice thereof was given him, and hence he was not suspended for not paying same. I further conclude that, if wrong with respect to the question of notice of assessments as above, the action of defendant's officer, on July 15, 1895, in accepting part of the sum by him claimed, and allowing Rothschild to leave under the impression that he was protected, and that payment of the $2.15 balance next morning would be satisfactory, estops defendant from claiming a forfeiture of the policy."

*Opinion.*—1. It is fully conceded that the assured became suspended on June 1, 1895, on account of failure to pay the May assessment of $2, and that his certificate or policy of insurance was thereby canceled and ceased to have any effect as an obligation on the part of the Order.

Did he become reinstated as a member, and thereby give life and force to the policy of insurance? The laws of the Order provide that such a suspended member may reinstate himself at any time within three months, if in usual health, by payment of all arrearages of every kind. The trial judge holds that the $2 paid on July 15, 1895, constituted all the arrearages chargeable to the assured, inasmuch as he had not been formally notified of the June assessments and charges, amounting to $2.15; that it could not become an arrearage until notice was given to the suspended member. This is not a question of the forfeiture of membership and the policy held in the Order. It is a question, whether

a membership and policy, admitted to have been previously forfeited, has been restored to life and force.

We think it quite clear that the laws of the Order require, as a condition precedent to such restoration, the payment of all assessments and charges which are due at the time of the effort to reinstate, this payment to be made within the limited time of three months. By the rules and laws of the Order the May assessment must be paid before June 1, and the June assessment must be paid before July 1. Both of these assessments were left unpaid until July 15; upon that date the May charges were paid, and the statement made to the clerk that the June charges would be paid next day. Before the next day came, and while the June charges were yet unpaid, the assured was killed. It is true that the June charges could not under the laws of the Order, be properly demanded as necessary to a reinstatement of the suspended member, on account of the fact that he had not been given formal notice of the June assessment? The members who were in good standing had at that time, July 15, been required to pay the June assessment. The assured had ceased to be a member by defaulting on the May assessment, and we find nothing in the laws of the order which indicates that persons who have been suspended shall be given notice of assessments made after their suspension. While the laws of the order provide for notice of the assessments to be given members, they also declare it to be the duty of members, when they fail to receive such notice from the clerk, to inquire of him on or before the first day of each month whether there be any assessments or dues for which they are liable, and if there be any, they shall pay the same according to the call. The laws further declare that the officers of the camp are the agents of the assured members in giving such notice and in collecting and forwarding assessments to the Sovereign Camp, and that a failure to give notice of assessments and dues "shall not relieve a member from the payment of assessments or dues according to the call or requirements of the Sovereign Camp, or camp, and he shall stand suspended for non-payment of same as if he had received actual notice." These provisions make it clear that members may not rely upon the clerk for notice of assessments and dues longer than the first day of each month, but must, at their peril, at that time make inquiry for themselves. The provisions were a part of the contract of insurance and were binding upon the insured. "Every one insured by reason of membership in such a company is charged with a knowledge of its constitution and by-laws, bound by their requirements and entitled to the rights and privileges conferred by them. * * * The present order did not issue policies as do ordinary insurance companies, but delivered to the insured a benefit certificate, which, together with the positive regulations of the order, evidenced the contract between the member and the company, so far as the insurance was concerned." Splawn v. Chew, 60 Texas, 535; Ladies of Honor v. Grace, 60 Texas, 572; Knights of Labor v. Keener, 25 S. W. Rep., 1084.

We think the court below was in error in holding that the June assessment and dues were not due by the assured on July 15, on account of no notice having been given to him prior to that date.

2. Appellee's counsel urge that the June assessment and dues, amounting to $2.15, were not charges against the assured at the time he paid the May assessment, for the reason that he was suspended during the month of June; that he was not entitled to the benefits of the order during that time and could not be required to bear its burdens. It is true that the membership and benefit certificate of deceased was forfeited on June 1, and after that time his membership and certificate of insurance were as ineffective as if he had never been a member of the order. He could not be made liable for assessments and dues accruing while he remained in that condition; but, if he undertook to reinstate his membership and restore the validity of his certificate, he must have complied with the requirements of the laws of the order. If the laws of the institution required the payment of such assessments and dues as a condition precedent to his reinstatement, then he must have complied with them before he can be entitled to the benefits of membership. The laws required the payment of "all arrearages of every kind." To construe the provisions of the laws of the order bearing upon the subject of reinstatement of suspended members as not requiring the payment of assessments and dues accruing during suspension, would relieve the suspended member of burdens which he would have been compelled to bear had he not defaulted in payments justly chargeable to him, and place a premium rather than a penalty upon such default. We must give to these provisions their reasonable intendment, and not limit them beyond the fair import of the language used. The language "all arrearages of every kind," we think clearly implies all charges that have accrued and which could have been justly demanded of the assured had he not been in default.

3. Was the Sovereign Camp estopped to deny the reinstatement of the assured by the act of the clerk in receiving from the assured the $2 due for May assessments and receipting for same, while there remained $2.15 due for June assessment and dues?

The laws provide, as before shown, that the officers of the camp "in collecting and forwarding assessments to the Sovereign Camp shall be the agents of the members of the camp, and shall not be the agents of the Sovereign Camp." They also declare that "the clerk of the camp shall not by acts, representations, waivers or votes of his camp, have any power or authority not delegated to him or a camp by the constitution and laws of the order, to bind the Sovereign Camp, head camp or a camp." The laws do not invest the clerk of a camp with authority to reinstate a suspended member; his reinstatement depends upon and arises from payment by the suspended member to the clerk of all arrearages within the period of three months. The assured must be held to have known that the clerk had no authority to reinstate him to the benefits of the order, and that his reinstatement was dependent upon his own com-

pliance with the conditions made essential by the laws of the order. Having this knowledge, he could not have been misled by the act of the clerk, and there is no ground upon which the claim of estoppel can rest. Had the clerk of the camp expressly agreed to reinstate the suspended member, without a compliance with the conditions required by the laws of the order, having no authority to reinstate suspended members, and the assured being held to have knowledge of this fact, it is not believed that such conduct would estop a mutual benefit order, such as appellant. Bacon, Benefit Societies and Life Ins., sec. 426.

We are of the opinion that appellee was not entitled to recover, and the judgment of the court below is reversed, and here rendered for appellant.

*Reversed and rendered.*

---

### ON MOTION FOR REHEARING AND ADDITIONAL CONCLUSIONS.

FINLEY, ASSOCIATE JUSTICE.—At the request of appellee's counsel, we make this additional statement of the facts which appeared upon the trial of the cause:

Section B of the fundamental laws governing the Sovereign Camp and camps, in force after January 1, 1892, is as follows: "Notice of Assessments—On the 20th day of each month the sovereign counsel, commander or chairman of the finance committee shall determine the number of assessments, if any, necessary to provide for the payment of deaths which may be registered for payment during the ensuing month, and the sovereign clerk shall immediately mail notice thereof to the Sovereign Camp."

The following provision recited in the original conclusions appears in the laws of the order in force in 1892: "The officers of the camp in giving notice of assessments and in collecting and forwarding the asessments to the Sovereign Camp shall be the agents of the members of that camp, and shall not be the agents of the Sovereign Camp." The laws of 1892 were superseded by a new set of laws enacted in 1895, taking effect July 1st. This particular provision does not appear in the laws of 1895. There is, however, this provision in the last named laws: "The clerk of the camp shall not, by acts, representations, waivers or vote of his camp, have any power or authority not delegated to him or a camp by the constitution and laws of the order to bind the Sovereign Camp, head camp or a camp." The assessments and dues involved in this case were for the months of May and June, 1895, and therefore arose under the laws of 1892 in force up to July 1, 1895.

Sections 102, 123, and 131 of the constitution and laws of 1895 are as follows: "Sec. 102. It shall be the duty of the clerk to attend to and have charge of the records, correspondence, accounts and literature of the camp, and all miscellaneous matter pertaining to its general welfare. He shall keep accurate minutes of the proceedings of every meeting,

and notify the camp of all members becoming in arrears. Upon the rejection of an applicant, withdrawal or introduction of a member by card, or expulsion of a member, he shall immediately notify the sovereign clerk or head clerk thereof. He shall receive and receipt for all moneys due the camp, and pay the same to the banker, taking his receipt therefor; attest all orders drawn on the banker, also beneficiary certificates and other official documents, and attach the camp seal. He shall make all reports and mail or deliver all notices required of him by the Sovereign Camp or head camp officers, or such as are required by the laws of the order.

"As soon as he shall receive notice from the sovereign clerk or head clerk, as the case may be, that an assessment has been levied, he shall forward to the sovereign clerk or head clerk, payable to the order of the sovereign banker or head banker, as the case may be, by draft, with exchange, all beneficiary funds and Sovereign Camp or head camp general fund dues then on hand, together with all arrearages from members previously reinstated, and certificate fees for members for whom remittance has not been made and any other claims due the Sovereign Camp or head camp. He shall give a good and sufficient bond for the faithful performance of his duty in such sum as the camp shall direct, and receive such compensation for his services, from the general fund of the camp, as the members may determine.

"Sec. 123. On or before the fifth day of every month, the clerk of each camp shall forward to the sovereign clerk, or head clerk, as the case may be, unless otherwise notified, all beneficiary funds in his hands, together with all general fund dues and other claims due the Sovereign Camp or head camp. Said amounts shall be remitted in bank draft, with exchange, payable to the order of the sovereign banker or head banker, as the case may be. Accompanying said remittance the clerk shall also forward such detailed statement of the standing of the members in the camp and the respective amounts of each fund as shall be required for information of the sovereign clerk, upon blanks furnished for that purpose."

"Sec. 131. Should a member be suspended more than three and less than six months, for any cause, in order to restore him to beneficiary membership it will be necessary for him to present a certificate of good health from the camp physician, pay four monthly payments, as provided in section 120, one of which shall be retained by the clerk of the camp as advance payment and the other three immediately forwarded to the sovereign clerk, or to the head clerk, if under a head camp jurisdiction, be ballotted for, and must receive a majority vote of the members present at his camp when same is balloted upon, and upon acknowledgment of receipt of payments by the sovereign clerk, or head clerk, as the case may be, his beneficiary certificate shall again be in full force and effect."

The two dollars paid by Rothschild on July 15, 1895, to the clerk of the Memphis camp was by said clerk remitted to and received by John

P. Yates, chief clerk of the order, at the office in Omaha, Nebraska, August 7, 1895, and was retained by said Yates and credited by him on the account of Rothschild on the records of the order. This sum was for the May assessment, and was not tendered back until the institution of this suit. The tender was made in the answer, and the trial court found that the tender was regularly made. In official letters sent out from the Sovereign Camp to the clerks of the various camps there appears this statement: "Blank notices of assessments Nos. 47 and 48, due and payable during the current month, sent you this day. You are required to at once mail or deliver the same to every member whose certificate was dated by the sovereign clerk April 5, 1895, or prior thereto, the same being necessary to restore the beneficial fund of your camp, and provide for a future call." This communication is dated May 1st, and the same is to be found in statement of June 1st, except that the number of the assessment in the latter is 49.

These facts, found in addition to those stated in our original conclusions, were fully considered by us in the original consideration of the case; and they furnish no ground for a change in our disposition of the case.

The motion for rehearing is overruled.

*Overruled.*

Writ of error refused.

Delivered March 27, 1897.